James Randolph GRAHAM, II and Katrina Dawn Graham, natural father and mother, guardians and next friends of Donald Keaton Graham, a deceased minor, Appellants and Counter–Appellees,

v.

Joseph A. KEUCHEL, D.O.; W. Richard Loerke, D.O.; Benien Clinic, Inc., an Oklahoma corporation, Donald G. Dunaway, D.O.; Osteopathic Hospital Founders Association, an Oklahoma corporation, d/b/a Oklahoma Osteopathic Hospital, Appellees and Counter–Appellants,

and

Drs. Dean, Hall & Ryker, William E. Hall, M.D., and David E. Ryker, M.D., Defendants.

No. 72586.

Supreme Court of Oklahoma.

Jan. 26, 1993.

Jerry M. Melone, Matt A. Melone, Melone–Shepherd–Schroeder–Allred–Melone, Tulsa, for appellants and counter-appellees, James Randolph and Katrina Dawn Graham.

James K. Secrest, II, Edward J. Main, Secrest & Hill, Tulsa, for appellees and counter-appellants, Joseph A. Keuchel, D.O., W. Richard Loerke, D.O., and Benien Clinic, Inc.

Joseph M. Best, Joseph A. Sharp, John H.T. Sheridan, Best, Sharp, Sheridan & Stritzke, Tulsa, for appellee and counter-appellant, Donald G. Dunaway, D.O.

Pete Silva, Jr., Michael Barkley, John D. Clayman, Teresa G. Dreiling, Barkley, Rodolf, Silva, McCarthy & Rodolf, Tulsa, for appellee and counter-appellant, Osteopathic Hosp. Founders Ass'n, an Oklahoma corp., d/b/a Oklahoma Osteopathic Hosp.

OPALA, Chief Justice.

Two issues are dispositive of this appeal: [1] Was the supervening cause instruction in the wrongful death claim [1] fatally or reversibly flawed? [2] Did the trial court commit reversible error by instructing on "mistake of judgment" [2] when this jury charge was unwarranted by the evidence adduced in the trial of both claims? We answer both questions in the affirmative, reverse the judgment and remand the cause for a new trial not inconsistent with this opinion.[3]

1. Two separate causes of action were advanced below against the same defendants. One was the parents' claim, as next friends of Donald Keaton Graham, for his wrongful death; the other the mother's claim for her bodily injury.

2. For the explanation of "mistake of judgment," see infra Part II A.

3. We consider in Part III questions which, although not dispositive of this appeal, offer needed guidance upon retrial. These include only issues argued in the parties' briefs. Claims to

error for which there is no support in argument and authority are deemed abandoned. Hadnot v. Shaw, Okl., 826 P.2d 978, 981 (1992); Holbert v. Echeverria, Okl., 744 P.2d 960, 962 n. 4 (1987); Messler v. Simmons Gun Specialties, Inc., Okl., 687 P.2d 121, 129 n. 11 (1984); Peters v. Golden Oil Co., Okl., 600 P.2d 330, 331 (1979); Harley v. Jobe, 207 Okl. 296, 249 P.2d 468, 469 (1952); John Deere Plow Co. v. Owens, 194 Okla. 96, 147 P.2d 149, 153 (1944). We hence do not reach them either for discussion or resolution.

Two more issues are presented by counter-appeal: [1] Did the trial court err by failing to direct a verdict for defendants on the wrongful death claim? [2] Should the trial court have held that the mother's bodily injury claim was time barred? We answer both questions in the negative.

## ANATOMY OF LITIGATION

The plaintiff Katrina Graham [the mother] brought suit for her own bodily injury and was joined by her husband, as next friend [the parents], in a claim for their child's [Donald's] wrongful death.[4] Both causes were based upon negligent medical treatment the mother had received in connection with a pregnancy and miscarriage in 1981–1982.[5] The mother contended that the defendants [doctors][6] did not determine her blood type nor give her the anti-sensitization drug Rho–GAM,[7] which (a) caused her to become sensitized,[8] (b) seriously impaired her ability to bear healthy children and (c) placed her in great danger.[9] The parents argued that the doctors' negligent sensitization of the mother was the direct cause of Donald's fatal condition and his death.

Donald was born on December 19, 1983 with a hemolytic disease called erythroblastosis fetalis [EBF]; he died four days later. A child who is RH-positive may be born with EBF if its RH-negative mother has, during an earlier pregnancy, miscarriage or childbirth, become sensitized[10] to the D antigen which is present in RH-positive blood.[11] A sensitized RH-negative woman's blood contains antibodies which, during a later pregnancy,[12] may cross the pla-

4. The mother also sought damages for the doctors' *failure to warn her not to become pregnant after she had been sensitized.* A similar plea was made against the *doctors who had treated the mother's fourth pregnancy.* These demands were regarded as separate claims for "wrongful birth," which the *mother dismissed mid-trial.* For an explanation of a *"wrongful birth"* claim, *see Morris v. Sanchez,* Okl., 746 P.2d 184 (1987); for a description of each doctor's role in the scenario, *see infra* note 6.

 The trial court *dismissed as too remote* the *father's* separate claim for damages from sterilization undergone after Donald's death..

5. The 1981–1982 pregnancy was the mother's *third.* Her *first* pregnancy was terminated by a voluntary abortion in 1978; the *second* produced a healthy boy in 1980. The *fourth* (early 1983), like the third, ended in miscarriage. *Donald was born of the mother's fifth pregnancy.*

6. Dr. Donald G. Dunaway was the mother's *regular physician.* When she became pregnant in December 1981, he referred her to a *specialist in obstetrics,* Dr. Joseph A. Keuchel. The mother was examined by *Dr. Keuchel's partner,* Dr. W. Richard Loerke. The mother miscarried; she checked into the *Oklahoma Osteopathic Hospital* where Dr. Keuchel performed a dilation and curettage ("D & C"). We refer to Drs. Dunaway, Keuchel, and Loerke, Oklahoma Osteopathic Hospital, and Benien Clinic, Inc. as the *doctors. Other defendants,* Drs. Dean, Hall & Ryker, William E. Hall, M.D., and David E. Ryker, M.D., treated the mother during her *fourth pregnancy,* which ended in miscarriage. The latter physicians are not parties to this appeal; the claims against them were *dismissed* below.

7. The drug *Rho–GAM,* a hyperimmune globulin, *suppresses the immune response* which Rh-nega-tive mothers may develop to the Rh positive blood cells of their child.

8. If a woman with Rh-negative blood gets pregnant with an Rh-positive fetus there is a chance that some of the baby's blood will mix with the mother's. If this should happen, the mother would begin to produce antibodies to attack and destroy the foreign substance in her blood. *At the moment antibodies' production begins, the mother is said to be "sensitized."*

9. The mother urged that after her sensitization any accidental transfusion with Rh-positive blood could be lethal to her.

10. Statistics show that approximately 10 percent of Rh-negative mothers with Rh-positive fetuses become sensitized. *See* Roderic H. Phibbs, *Hemolytic Disease Of The Newborn (Erythroblastosis Fetalis),* PEDIATRICS 1028, 1029 (A. Rudolph & J. Hoffman eds., 18th ed. 1987).

11. The father must, of course, be RH-positive for sensitization to occur. The Rh-positive blood group includes (a) Rh-positive homozygous and (b) Rh-positive heterozygous. All of the children of an Rh-negative mother and an Rh-positive homozygous father will be Rh-positive. If the father is Rh-positive heterozygous, one-half of his children will be Rh-positive. *See* Phibbs, *supra* note 10 at 1029.

12. The antibodies are not manufactured in time to harm the child or fetus whose blood mixes with the mother's blood; they appear *after delivery* when the baby's circulation is already independent of the mother's. *It is the later children of a sensitized mother who are at risk.*

centa into the RH-positive fetus to attack and destroy its red blood cells. This may cause anemia in the fetus or in the unborn child. The anemia may range from a mild case, which can be remedied by blood transfusion at birth, to severe anemia (EBF) which is often lethal to the baby—as it was in the case before us now.[13]

Sensitization can usually be prevented[14] by giving an RH-negative mother the drug Rho–GAM[15] during all pregnancies[16] and after every miscarriage, abortion or birth of an RH-positive fetus or child.[17] Failure to give Rho–GAM to an RH-negative mother of an RH-positive fetus or child at the proper time increases the risk of the immune response and its consequences for later pregnancies—i.e., the possibility of severe fetal harm or death.

The parties stipulated the mother has Rh-negative blood and is presently sensitized to the Rh factor. The doctors denied any negligence in the mother's treatment and contended that (1) the statute of limitations had run on her claim[18] and (2) her sensitization was not caused by the 1982 miscarriage.[19] They also urged that, if they *were* negligent, the mother was *contributorily negligent* for failing to tell them she (a) is Rh-negative and (b) had received Rho–GAM before.[20]

The doctors also disclaimed responsibility for Donald's death. They urged that a superseding cause cut off their liability to the parents because the mother had (1) *willfully* conceived Donald (2) with full knowledge that she had been sensitized and (3) with complete appreciation of the serious risk of harm to herself and to the child.

This appeal was lodged from a judgment on a jury verdict in favor of the doctors on both claims. The doctors counter-appeal.

---

**13.** About fifteen percent of fetuses with Rh hemolytic disease die before birth. The first fetus affected is not usually severely afflicted, but *about three percent of the first-affected are stillborn. See* R. Phibbs, *supra* note 10 at 1030.

**14.** Even if Rho–GAM is properly administered, the drug may not prevent sensitization in *all* Rh-negative women.

**15.** Rho–GAM, which became available in 1968, was considered a *miracle drug* because it *effectively eliminated the risk of EBF* in the children of an Rh-negative mother whose father was Rh-positive.

**16.** Rho–GAM was not routinely given *during* pregnancy until 1983. It is then that Rho–GAM at 28 weeks' gestation and another dose following delivery became the standard treatment.

**17.** *See Phibbs, supra* note 10 at 1029.

**18.** According to the doctors, *the mother knew or should have known she was sensitized after she had called Dr. Keuchel in April 1982.* The doctor testified that he explained: (1) he had not typed her blood, (2) she might be sensitized and (3) *before she became pregnant again,* she should have a blood test to find out if she had been sensitized. The mother contends he told her (1) she did not receive Rho–GAM *because she did not tell him she was Rh-negative,* (2) failure to get the drug would *pose no problems* and (3) *when she got pregnant again* he would do a "titer" test on her. She told him that "he" would do nothing on her and hung up on him.

The doctors urge the jury can infer from the mother's anger that *she knew then that she was sensitized.* The mother denies that in the conversation (a) the doctor used the word "sensitized" or (b) she realized the full implications of failure to receive Rho–GAM. She ascribes her anger to being *blamed for not telling the physician she was Rh-negative.*

The doctors also contend the mother learned from a March 1983 blood test that she had been sensitized. *See infra* note 136.

**19.** The doctors advanced several *theories of defense:* (1) the mother was not a fit candidate for Rho–GAM because *more than 72 hours had elapsed* after the mother's miscarriage before they could treat her; (2) the mother became sensitized when an *insufficient amount of Rho–GAM had been given her in 1980* after the birth of her first child, a healthy boy and (3) she could not have become sensitized in the course of the 1981–1982 pregnancy and miscarriage because she then carried but a *"blighted ovum"* rather than a fetus.

A *"blighted ovum"* is an *arrested pregnancy*—i.e., one where the embryo stops growing. Sensitization cannot occur in that context because a fetus does not develop; *there are no blood vessels and hence no mixing of the fetal blood with the mother's.*

**20.** The mother *had received Rho–GAM* when she had a voluntary abortion *in 1978 and again in 1980* when her first child was born.

## I

## THE WRONGFUL DEATH CLAIM

### A.

### CORRECT LIABILITY ANALYSIS FOR THIS CASE WILL NOT SANCTION AS SUPERVENING CAUSE A MOTHER'S NEGLIGENT CONCEPTION BUT ONLY HER WILLFUL SEXUAL BEHAVIOR IN THE FACE OF FULLY UNDERSTOOD MEDICAL WARNING OF THE DANGEROUS CONSEQUENCES

■ One of the essential elements of actionable negligence requires that the act or omission complained of be the *direct cause* of the harm for which liability is sought to be imposed.[21] Not every *intervening* cause insulates the original negligent actor from liability.[22] When a cause *combines* with another act or omission to produce the injury[23] or several causes operate to bring about the same result,[24] *each negligent actor may be liable for the harm that evolves*. To rise to the magnitude of a *supervening* cause, which will *insulate* the original actor from liability, the new cause must be *(1) independent of the original act, (2) adequate of itself to bring about the result and (3) one whose occurrence was not reasonably foreseeable to the original actor*.[25]

The doctors urged below that the jury might infer from the evidence that the mother (1) knew that she had been sensitized, (2) had been warned and understood completely the medical statistics indicating the degree of danger to both mother and child when a sensitized mother has a baby and (3) willfully engaged in sexual conduct intended to bring about conception with the full resolve of carrying the fetus to term. In short, they urged that she intentionally exposed Donald to the risk and danger which ultimately resulted in his death. *According to the doctors, a "willful pregnancy" under those conditions would be a supervening cause that cuts off their liability.* Over the parent's objection the trial court submitted to the jury a supervening cause instruction.[26]

■ The parents argue that the evidence at trial did not warrant a supervening cause instruction; they point to *Strong v. Allen,*[27] where a father's lax supervision of his child—*there* considered to have been ordinary negligence—failed the three-prong test[28] for isolating supervening cause. According to the parents, the mother's negligence in becoming pregnant—just as the father's ordinary negligence in *Strong*—cannot legally support a supervening cause instruction.

Two firmly settled rules of law coverage to prevent a parent's *negligent act* from operating as a *cause that would supervene an original actor's substandard behavior*.[29] Firstly, a parent's *ordinary negli-*

---

**21.** *Thompson v. Presbyterian Hospital, Inc.,* Okl., 652 P.2d 260, 263 (1982).

**22.** *Minor v. Zidell Trust,* Okl., 618 P.2d 392, 394 (1980); *Brodsky v. Atchison, Topeka & Santa Fe Railway Co.,* Okl., 368 P.2d 852, 854 (1962).

**23.** *Minor, supra* note 22 at 394; *Champlin Oil and Refining Co. v. Roever,* Okl., 477 P.2d 662, 667 (1970); *City of Okmulgee v. Hemphill,* 183 Okl. 450, 83 P.2d 189, 191 (1938); *Meyer v. Moore,* Okl., 329 P.2d 676, 681 (1958).

**24.** *Minor, supra* note 22 at 394; *Hemphill, supra* note 23, 83 P.2d at 191; *Green v. Sellers,* Okl., 413 P.2d 522, 528 (1966).

**25.** *Thompson, supra* note 21 at 264; *Long v. Ponca City Hospital, Inc.,* Okl., 593 P.2d 1081, 1084 (1979).

**26.** Instruction 24 states:

"With respect to the plaintiff's claim for the wrongful death of their child only, you are instructed that if, following this (sic) alleged negligent acts or omissions of the named defendants, the mother, Katrina Graham, with full knowledge that she had been sensitized and with full appreciation of the risks and danger of subsequent pregnancies, *elected to become pregnant* with Donald Graham, then the named defendants negligent act (sic) or omissions were not a direct cause of the death of the child." [Emphasis supplied.]

**27.** Okl., 768 P.2d 369, 371 (1989).

**28.** For the three-prong test, *see supra* the text at note 25 and note 25.

**29.** While an *intervening* cause may ordinarily *combine* with a co-actor's negligence to operate as a *concurring cause* of the injury, under the circumstances present here *the same strictures*

*gence* may not be *imputed* to a child of tender years to bar or reduce the child's recovery against a third party.[30] Secondly, except for the very narrowly carved exception which permits filial recovery for insured losses from vehicular negligence,[31] a child cannot *recover from a parent* for the latter's *ordinary negligence,* which causes or contributes to the child's injury or death.[32] These principles combine here to prevent the doctors from *directly or obliquely* shifting to the mother, in whole or in part, their own tort liability for harm to the child. No parent's act or omission is hence available as a *supervening cause if it is rested on ordinary negligence.*[33] Because the law's *barrier does not reach into willful acts,*[34] the doctors may not be deprived of that legal defense against the death claim which lies beyond the perimeters of the mother's ordinary negligence.[35]

## B.

## SUFFICIENCY OF THE EVIDENCE TO SUPPORT A SUPERVENING CAUSE INSTRUCTION

▆▆▆ A person is not *generally* deemed liable at common law for a *third party's deliberate act.*[36] *A third person's intentional tort is a supervening cause of the harm that results*—even if the actor's negligent conduct created a situation that presented the *opportunity* for the tort to be committed—*unless* the actor realizes or should realize the *likelihood* that the third person might commit the tortious act.[37] A

---

*that keep a parent's ordinary negligence from operating as a supervening cause also militate against instructing the jury that the mother's ordinary negligence may combine with that of the doctors as a concurrent cause of the child's injury and death.*

*Although the parents do not raise as error the trial court's submission of a concurrent cause instruction to the jury without the explanation that it does not apply to the wrongful death case,* the giving of that instruction in the case based on the child's claim is fundamental error. *Fundamental error* is narrowly defined as a substantial misstatement of a legal principle which appears on the face of the instruction. *Sellars v. McCullough,* Okl., 784 P.2d ˙1060, 1062–1063 (1990). *See Wetsel v. Independent School Dist. I–1,* Okl., 670 P.2d 986, 995 (1983). Were we to allow the mother to be considered a *negligent co-actor in harming the child, partial blame* would impermissibly be assigned to the parent as *obliquely concealed negligence* in contravention of the two *public policy* concepts discussed in our liability analysis, *infra* this part.

**30.** *Strong, supra* note 27 at 370; *Hostick v. Hall,* Okl., 386 P.2d 758, 761–62 (1963); *Atchison, T. & S.F. Ry. Co. v. Calhoun,* 18 Okl. 75, 89 P. 207, 209 (1907). *See* Restatement (Second) of Torts, § 485, comment c (1965), which provides in pertinent part:

"With ... [certain] exceptions, the *common law* no longer imputes the negligence of a third person to the plaintiff to bar his recovery for the harm he has suffered ...." [Emphasis supplied.]

**31.** For the exception, *see Unah v. Martin,* Okl., 676 P.2d 1366 (1984).

**32.** *Sixkiller v. Summers,* Okl., 680 P.2d 360, 361–362 (1984). In *Sixkiller,* we approved the no-

tion that parental immunity does not extend to *willful conduct;* to be *willful,* the act or omission must be *deliberate, intentional or wanton.* It must be done with a person's *knowledge or appreciation of the fact that danger is the likely result.* For a similar definition of willful conduct, *see Leigh v. Wadsworth,* Okl., 361 P.2d 849, 853 (1961).

**33.** The barrier against imputing parents' negligence applies only to (1) tort cases with a child-plaintiff or (2) claims for the wrongful death of a child—since a death action rests on tortious conduct for which the child, had it lived, could have maintained an action. *Haws v. Luethje,* Okl., 503 P.2d 871 (1972); *Hill v. Graham,* Okl., 424 P.2d 35, 37 (1967).

**34.** *Sixkiller, supra* note 32 at 361–362.

**35.** *One can ordinarily defend against a tort claim by showing that the harm to be vindicated was committed by a third party. Paul v. N.L. Industries, Inc.,* Okl., 624 P.2d 68, 69 (1981).

**36.** *Respondeat superior liability* does not always fall within this general rule of non-liability. An *employer* may be liable to a third party for an employee's *willful tort* whenever the employee was acting *within the scope of his employment* and *the act was done in furtherance of the employee's assigned work. Beard v. Richards,* Okl., 820 P.2d 812, 817 (1991); *Ada–Konawa Bridge Co. v. Cargo,* 163 Okl. 122, 21 P.2d 1 (1933).

**37.** *Thompson, supra* note 21 at 264; *Long, supra* note 25 at 1087. For an eloquent example of the *special circumstances* that may lead to liability, *see Mistletoe Express Service v. Culp,* Okl., 353 P.2d 9, 16 (1960). *See also* Restatement

negligent actor is *not* bound to *anticipate* another's wrongful act *after the latter has discovered the danger* that arises from the former's negligence.[38] *Lapse of time* or other reason—such as, e.g., the third person's *discovery* of the original actor's negligence or the former's *deliberate assumption of control* of the situation—may cause the *duty to prevent harm to another*, threatened by the original actor's negligent conduct, to shift from that actor to the third person. When this happens *the third person's failure to prevent the threatened harm may be a supervening cause.*[39]

Our *three-prong test for supervening cause governs* the wrongful death claim. There must be proof tending to show that the child's injury and death resulted from the mother's *sexual conduct intended to bring about conception* that was (1) *not reasonably foreseeable* to the doctors, (2) *independent* of the doctor's substandard conduct and (3) *adequate of itself* to bring about the result.[40]

### 1.

### WHETHER THE MOTHER ENGAGED IN WILLFUL CONDUCT INTENDED TO BRING ABOUT CONCEPTION IN THE FACE OF A KNOWN AND FULLY APPRECIATED DANGER WAS A QUESTION OF FACT

■ There was no *direct evidence* of the mother's intent to become pregnant at the time she conceived Donald. Proof shows *earlier in the same year in which Donald was born* she was trying to conceive a child. A February 25, 1983 test confirmed she was pregnant, but she miscarried in late March. A doctor advised her to *wait at least three menstrual cycles before becoming pregnant again.* Her last menstrual period before she conceived Donald was in May 1983. Although an ultrasound test showed that the child was due in January, he was born December 19, 1983. *In sum, the timing unfolds evidence from which a willful conception could be inferred; whether the mother was actually engaging in sexual conduct intended to bring about conception when she became pregnant with Donald is clearly for the trier to decide. Intentional conception alone will not make the mother's conduct a supervening cause of the child's wrongful death; it must be coupled with full knowledge of the consequences and appreciation for the dangers involved.*

### 2.

### UNDER THE CIRCUMSTANCES PRESENT HERE, FORESEEABILITY OF THE MOTHER'S FIFTH PREGNANCY WAS A QUESTION OF FACT

■ The parents contend the challenged supervening cause instruction did not allow the jury to consider one of the critical elements of supervening cause—i.e., foreseeability to the doctors of the mother's pregnancy.[41] The trial court held that the doctors could not have foreseen that the mother would wilfully engage in conduct intended to bring about conception. Yet foreseeability in these circumstances may

(Second) of Torts, *supra* note 30 at § 448, which provides:

"The act of a third person in committing an intentional tort or crime is a *superseding cause* of harm to another resulting therefrom, *although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort* or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime." [Emphasis supplied.]

**38.** *E.I. Du Pont De Nemours & Co. v. Ladner*, 221 Miss. 378, 73 So.2d 249, 255–256 (1954). For a factual scenario that demonstrates the rule's application, *see Pollard v. Oklahoma City Ry. Co.*, 36 Okl. 96, 128 P. 300, 303 (1912).

**39.** *See* Restatement (Second) of Torts, *supra* note 30 at § 452(2), which provides:

"Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause."

*See also, Pollard, supra* note 38, 128 P. at 303–304.

**40.** *Thompson, supra* note 21 at 264.

**41.** If the intervening cause was in fact foreseeable by the doctors, their negligence would be considered the efficient cause of the child's death. *Long, supra* note 25 at 1085.

depend upon several factors, some of which might not have been fully unveiled at trial. The mother is of child-bearing age and there is no evidence that she had undergone any sterilization procedure. The mother admitted she had been told in 1978 that (1) she was Rh-negative and would need Rho–GAM after *every miscarriage, abortion or childbirth* and (2) there was a danger to later children if she did not receive it on any of those occasions. She contends she didn't think at the critical time about the earlier warnings.[42] Although the mother admitted Dr. Keuchel told her she did not receive Rho–GAM after her 1982 miscarriage, other parts of their conversation are *in dispute*.[43] For example, while Doctor Keuchel urges he told the mother she would need a blood test *before she became pregnant again*, she denies it.

In sum, *what* the mother was *told* about her condition, *what* she *knew* and *understood* about it, *who* told her and *when* she was told are all disputed fact questions that bear on foreseeability. If in light of the evidence, the triers can say the mother was *not* adequately warned, then they might find it was *foreseeable* to the doctors that she would become pregnant. If she was adequately warned, but failed to appreciate the danger, her pregnancy might also be *foreseeable*. The doctors, on the other hand, would *not be accountable for foreseeing* that an adult female patient, who is *sui juris*, would willfully conceive in the face of the substantial risk of *known and appreciated* danger of severe disability or death to her child.

**42.** The parents contend *inter alia* that because the evidence does not show *conclusively* that injury to the child was *inevitable*, it is *foreseeable* that a mother, knowing that she had been sensitized, might intentionally conceive a child. If the child being carried were Rh-negative, there would be absolutely no harm to the child. The parents also point to evidence that in some cases the effects of sensitization on an Rh-positive child are not as severe as they were in this case: (1) the harm can sometimes be avoided by an intrauterine blood transfusion or one done immediately after a child's birth or (2) an early delivery of the child might sometimes avoid adverse consequences.

The jury might infer from this proof that once a sensitized mother had conceived, steps could

## 3.

## UNDER THE CIRCUMSTANCES PRESENT HERE, WHETHER THE MOTHER'S ACTS WERE AN "INDEPENDENT FORCE" WAS A QUESTION OF FACT

 According to the doctors, their relationship with the mother was *severed* at the conclusion of her miscarriage in January 1982, but at the very *latest* in April 1982 when she hung up on Dr. Keuchel.[44] They seem to suggest that (1) she *had deliberately assumed control of the situation* and (2) they were *powerless to prevent* the harm that happened almost two years after their alleged failure to administer Rho–GAM. Although evidence shows that the doctors were *not* treating the mother at the time she conceived Donald, she urges that Dr. Keuchel had *lulled her into a false sense of security* about the danger of future pregnancies by telling her that failure to receive Rho–GAM would *pose no problem*. This *dispute* clearly makes the *independent-act prong* of the *supervening-cause* test a question for the *triers*.

## 4.

## ADEQUACY OF THE MOTHER'S CONDUCT TO BRING ABOUT THE CHILD'S WRONGFUL DEATH WAS A QUESTION OF FACT

 A remote cause which merely furnishes the *occasion* for an injury which results from an intervening efficient cause cannot be the predicate for liability, *even though the injury would not have hap-*

be taken to *minimize the potential damage*, but the proof is far from conclusive that it was fully foreseeable to the doctors that a mother—who has been fully apprised of medical statistics indicating the degree of danger that occurs when a sensitized mother conceives—would intend to bring about conception. *The evidence does show the mother might have misunderstood whatever warning and instructions she might have received.*

**43.** For details of the dispute, *see supra* note 18.

**44.** For two versions of the conversation, *see supra* note 18.

pened "but for" the earlier incident.[45] It is when the first occasion results in injury which might have been anticipated or *which rendered the avoidance of injury impossible* that it will be the proximate cause in spite of an intervening agency.[46] *Hence whether the mother's conduct was adequate of itself to bring about Donald's injury and death cannot be measured by applying a simple "but for the doctors' negligence" test.*[47] The adequacy-of-conduct factor of the three-prong test for gauging supervening cause must take into account both *the nature of the risk*[48] *and the character of the intervening cause.*[49]

If, after her sensitization, the mother intentionally became pregnant with full knowledge of the consequences, her risk-taking conduct would not be prudent; rather, she would be viewed as *exposing herself imprudently to a known and appreciated risk, which she need not have taken.* Once she *had become sensitized,* her underlying physical condition was *irreversible* and *unalterable.* The only action the doctors could have taken to ward off the harm that later occurred was to warn the mother of the consequences of her sensitization; they had no control over whether she would become pregnant again. In short, if she (1) knew that her reproductive capacity was impaired, (2) had been given adequate warnings about the dangers of conceiving in her sensitized condition and

---

**45.** *Pepsi–Cola Bottling Co. of Tulsa, Okl. v. Von Brady,* Okl., 386 P.2d 993, 996 (1964). We noted the following rule:

"Liability cannot be predicated on a prior and remote cause which merely furnishes the condition or occasion for an injury resulting from an intervening unrelated and efficient cause, *even though the injury would not have resulted but for such condition or occasion;* but a condition from which injury might have been anticipated or which rendered the avoidance of injury impossible will be the proximate cause notwithstanding an intervening agency." [Emphasis supplied.]

**46.** *See Pepsi–Cola, supra* note 45 at 996, where the defendant's truck was negligently parked on the right side of the street; it was broad daylight and the truck was clearly visible for a long distance in the direction from which plaintiff approached. The negligence of a third party in crowding the plaintiff to the extent that he was forced to crash into the parked truck was held to be the supervening cause of plaintiff's injuries. *See also Oklahoma Power & Water Co. v. Howell,* 201 Okl. 615, 207 P.2d 937 (1949), where defendant's trucks were blocking the highway when they were struck by plaintiff's driver's truck. Plaintiff's driver observed the blocked highway early enough to have stopped easily but could not do so because of the condition of his own truck. Plaintiff's driver's actions were a supervening cause of the plaintiff's injuries. In both instances, if the defendants had not negligently parked their trucks, the injuries would not have happened. Since the trucks were positioned so that other drivers had sufficient warning of the danger, later actions of drivers were held to be adequate of themselves to bring about the results.

**47.** Supervening cause was a question for the jury in *Brigance v. Velvet Dove Restaurant, Inc,* Okl., 725 P.2d 300, 305 (1986) and *Long, supra* note 25 at 1086; it insulated a negligent party

from liability in *Thompson, supra* note 21 at 265. *See also Minor, supra* note 22 at 395; *Runyon, infra* note 49 at 950; *Curtis, infra* note 48 at 493. The facts did not support a supervening cause defense in the following cases: *Strong, supra* note 27 at 371; *Champlin Oil and Refining Company v. Roever,* Okl., 477 P.2d 662, 666 (1970); *Hobson v. Carman,* Okl., 365 P.2d 560 (1961); *Stout v. Rutherford,* Okl, 341 P.2d 266, 269 (1959); *Magnolia Petroleum Co. v. Sutton,* 208 Okl. 488, 257 P.2d 307, 313–314 (1953); *Oklahoma City–Ada–Atoka Ry. Co. v. Crabtree,* 207 Okl. 327, 249 P.2d 445, 447–450 (1952).

**48.** A *prudent* risk might *not* break the causal connection. For example, a plaintiff was injured when he tried to extricate his cow from an open and unbarricaded ditch left in his pasture by a pipeline company. The defendant contended the plaintiff's rescue attempt was a supervening cause that insulated it from liability for his injuries. We held that plaintiff's actions were *not* a supervening cause because he (a) *made a prudent effort,* (b) *did not unduly expose himself to danger* and (c) *was impelled by necessity, from his viewpoint, to release the cow from the ditch. Curtis v. Shell Pipe Line Corp.,* Okl., 265 P.2d 488, 491–493 (1954).

**49.** Suicide serves as an example of a supervening force which *may break the causal chain* between a wrongful act and a decedent's demise in a wrongful death action. A pharmacist sold, without the physician's permission, a "non-refillable" prescription. A depressed person overdosed on the illegal drug. *But for* the illegal act of the pharmacist, the suicide could not have taken place. *Yet we held that if the decedent willfully committed suicide, knowing the physical effect of his deed, his final act was a supervening cause of his death. Runyon v. Reid,* Okl., 510 P.2d 943, 950 (1973). *See* Civil Liability for Suicide, Annot., 11 A.L.R.2d 751 (1950).

(3) completely understood the medical risk to herself and to her child if she conceived in a sensitized condition, the *forces set in motion by the doctors failure to give her Rho–GAM may be said to have become passive—i.e., they would not be harmful to the mother unless she intervened to bring about the harmful result.*[50] If she undertook unreasonable risks by becoming pregnant in her sensitized condition, the harm for which she is suing is not attributable to the doctors, but to the *normal risks of pregnancy for a woman who has been sensitized.*

All three supervening-cause elements are *inextricably intertwined* with whether the mother engaged in sexual conduct intended to bring about conception with full knowledge of the consequences; *they cannot be considered in isolation.* Some of the evidence mentioned in connection with foreseeability is equally pertinent to whether the mother's conduct was itself adequate to bring about the result.[51]

Considering the *intentional nature of the conduct with which the mother is charged and the extreme risk she is alleged to have taken,* the triers might find that at some point in the causal chain the moral culpability of the original negligent actors may have been transmuted into a remote cause. *In short, whether (a) the mother's sexual conduct was intended to bring about conception, (b) was carried on in the face of fully understood prior medical warning and (c) was hence adequate of itself to bring about the result was for the jury to decide.*

In sum, ample evidence supports the correctness of giving a supervening cause instruction. Factual disputes govern *all the critical components* for deciding whether the mother's conduct in bringing about conception is a *supervening cause* that resulted in Donald's injury and death.

## C.

## FATAL INFIRMITIES OF THE CHALLENGED SUPERVENING CAUSE INSTRUCTION

■ The supervening cause instruction not only withheld foreseeability from the jury's consideration, but also told the triers, in essence, that if the mother *"elected to become pregnant"* with full knowledge that she had been sensitized and full appreciation of the risks and danger of later pregnancies, the doctors' negligence was not a direct cause of the child's death.[52] Because tortious conduct is divisible into at least three groupings: negligence, gross negligence, and willful negligence, the phrase "elected to become pregnant"—*deceptive in its simplicity*—is *clearly ambiguous.* Does it mean: (1) willful disregard for her own safety and that of the child, (2) sexual conduct intended to bring about pregnancy in the face of a known danger, (3) not using safe contraceptives, (4) using inadequate precautions, (5) not aborting the fetus, (6) not using prescribed methods of contraception or (7) something else entirely?

The instruction's *simplicity* is *deceptive* and *misleading.* The jury might believe that if a woman in the mother's position became pregnant, she would be the sole cause of the harm. In short, the instruction gives the jury the false impression that *the mere act of conceiving and nothing more would be enough to constitute a supervening cause.* Rather, it is the sexual conduct *intended to bring about conception in the face of known danger to oneself and to one's child—or the reckless disregard of that danger—that would form the supervening cause.*

To rule out the possibility that the jury might have misunderstood supervening cause and confused it with a parent's contributory negligence, the jury should have been carefully instructed on the difference between a parent's ordinary negligence,

---

**50.** If the doctor's negligence could never be transmuted into a remote cause, repeated pregnancies on the mother's part could result in multiple consecutive suits against the doctors.

**51.** *See supra* Part I B.2.

**52.** For the text of the supervening cause instruction, *see supra* note 26.

which could *not* be a supervening cause and her willful act, which might, *in some instances*, cut off the doctors' liability.[53] The predictable failure of birth control methods could lead to a pregnancy that would *not* be a supervening cause. As we have explained in connection with our discussion of foreseeability, the mother's act of conceiving, *however willful*, would not insulate the physicians from liability *in all situations*.[54] The challenged instruction did not tell the jury what kind of behavior on the mother's part would shield the doctors from liability nor did it require the jury to find that the mother was guilty of that kind of conduct.[55]

## D.

### THE ERRONEOUS SUPERVENING CAUSE INSTRUCTION REQUIRES THE JUDGMENT'S REVERSAL

 It is error for a court to treat a controverted fact as a question of law and withhold the issue from the jury, as the trial court did with foreseeability.[56] The test to be used when reviewing an instruction improperly given is whether there is a probability that it misled the jurors and caused them to reach a result different from that which they would have reached but for the flawed jury charge.[57] Both the parents' claim for the child's wrongful death and the doctors' supervening cause defense present complex issues. We have no doubt that the jury was confused by the oversimplified instruction—especially by the ambiguous phrase "elected to become pregnant." The challenged instruction did not require the jury to find that (1) the mother engaged in sexual conduct *intended* to bring about conception in the face of a *known and appreciated danger* to herself and the child or acted in reckless disregard of her own and the child's well-being, (2) her behavior was unforeseeable to the doctors and (3) she took charge of the situation, unleashing an independent force that was adequate of itself to bring about the child's injury and death. The challenged jury charge cannot pass muster; *the death case was undoubtedly prejudiced by the flawed instruction.* A new trial is clearly the parents' due.

## E.

### SUPERVENING CAUSE'S ADAPTATION TO FIT THE CLAIM FOR THE CHILD'S WRONGFUL DEATH

We do *not redefine supervening cause* by confining its use to tortious conduct

---

**53.** The supervening cause defense, *under the particular circumstances of the case here for review*, has some of the same attributes as the *volenti* doctrine, discussed *infra* note 80. Just as it would for a *volenti* defense, the jury here must examine into the mother's *subjective knowledge and appreciation of the risk involved* when deciding whether the mother acted *willfully*. In contrast, *contributory negligence* is based on an objective standard of conduct which, though it may be inadvertent, falls below the degree of care which would have been exercised by a *reasonable person*. It often involves the inquiry as to whether the conduct of the plaintiff falls below that of a *reasonably prudent woman acting for her own protection* and whether *that is a contributing cause of the injury*. It implies the omission of a duty on the part of the injured person and *excludes the idea of willfulness. See Detrick v. Garretson Packing Company*, 73 Wash.2d 804, 440 P.2d 834, 837 (1968).

**54.** The doctors seem to suggest that the mother's *knowledge that she did not receive Rho–GAM* was *equivalent to knowledge that she had been sensitized.* Sensitization does not occur in *all* cases. *See supra* note 10. Sometimes sensitization *cannot be detected*—even by a *blood test*—

except during the next pregnancy. *See infra* note 135.

**55.** A proper explanation would include language to the following effect: If you find that (1) the mother engaged in sexual conduct *intended to bring about conception in the face of a known danger,* not only to *herself* but to the *conceived child's well-being,* or if she became pregnant in *reckless disregard* of the child's well-being and (2) her conduct was unforeseeable to the physicians and hospital, and was independent and adequate of itself to bring about the result, then you may conclude that *the mother's willful act* or act in reckless disregard of the child's well-being was the *sole cause* of the child's physical condition from which he died, and if so, you may find *in favor of the defendant physicians and hospital.*

**56.** *Texaco, Inc. v. Layton*, Okl., 395 P.2d 393, 399 (1964).

**57.** *Woodall v. Chandler Material Co.*, Okl., 716 P.2d 652, 654 (1986); *Champlin, supra* note 23 at 667; *Karriman v. Orthopedic Clinic*, Okl., 516 P.2d 534, 540 (1973). ·

that is *willful.* Rather, we *adapt* the concept, as we must, to make it *fit this claim for a child's wrongful death.* While the doctors cannot invoke the mother's *negligence* in defense of the death claim they are entitled to defend against it by *showing that the mother willfully brought about conception in spite of what she knew to be the consequences and hence her acts were the sole efficient cause of the child's harm.* Intertwined with supervening cause is here the mother's knowledge, if any she had, of her impaired reproductive capacity. *If the jury should believe that she had been adequately warned of her sensitized condition and of its medical consequences, the jury might conclude that her intended conception in the face of a known danger was the independent adequate and unforeseeable force that constituted the supervening cause of harm. On the other hand, the triers might reach a different assessment if they should believe that, when she conceived, she was unaware or insufficiently informed of her reproductive disability.*

## II

### THE MOTHER'S CLAIM FOR BODILY INJURY

### A.

### MISTAKE OF JUDGMENT AS A DEFENSE

■■■ The trial court instructed the jury that *"if [the doctor] possesses ordinary learning, skill, and experience and exercises ordinary care in applying same, he is not responsible for mistakes of judgment."*[58] Mistake of judgment was *not* defined for the jury and the court did *not* give the accompanying OUJI instruction that puts mistake of judgment in its proper context—*i.e.,* defines it as a situation in which the doctor faces a choice of alternative treatments.[59]

A physician, facing a range of competing options which are *all medically acceptable,* may choose one which later proves to have been *less effective* than another might have been. Selection of any of these options is not negligence. The choice is said to be a matter of judgment and choosing a less effective option is considered a mistake of judgment.

The plaintiffs urge[60] that Oklahoma should join a number of other jurisdictions which have disapproved mistake-of-judgment instructions.[61] The chief criticism is

"A physician is not bound to use any particular method of treatment or surgery with his patient. If among physicians of ordinary skill and learning more than one method of treatment or surgical operation is recognized as proper, it is not negligence for a physician in good faith to adopt and use either of such methods of treatment or surgical operation."

**58.** The mistake of judgment instruction No. 17, like Oklahoma Uniform Jury Instructions [OUJI] 13.5, provides:

"Unless he states or agrees (contracts) otherwise, a physician employed to treat a person impliedly warrants that he possesses that degree of learning, skill, and experience ordinarily possessed by others of his profession practicing in the same field in the same or a similar locality at the same time, and that he will use ordinary care in the exercise of his skill and the application of his knowledge and experience to accomplish the purpose for which he is employed, and that he will use his best judgment in the exercise of his skill in diagnosing the condition and in treating the patient. He does not warrant a cure and is not responsible for the lack of success unless that lack results from his failure to exercise ordinary care or from his lack of ordinary learning, skill, and experience. *If he possesses ordinary learning, skills, and experience and exercises ordinary care in applying same, he is not responsible for mistakes of judgment."* [Emphasis supplied.]

**59.** The trial court did not give an instruction like OUJI 13.5, which provides:

**60.** The mistake-of-judgment instruction is urged as error in both the mother's bodily injury cause and the parents' claim for the child's wrongful death.

**61.** See, e.g., *Shumaker v. Johnson,* 571 So.2d 991, 996 (Ala.1990); *Sasser v. Connery,* 565 So.2d 50, 53 (Ala.1990) (Hornsby, C.J., concurring specially); *Leazer v. Kiefer,* 120 Idaho 902, 821 P.2d 957, 965–967 (1991); *Rogers v. Meridian Park Hospital,* 307 Or. 612, 772 P.2d 929, 931–933 (1989); *Kobos v. Everts,* 768 P.2d 534, 539 (Wyo.1989); *Ouellette v. Subak,* 391 N.W.2d 810, 815 (Minn.1986); *Wall v. Stout,* 310 N.C. 184, 311 S.E.2d 571, 577 (1984); *Logan v. Greenwich Hospital Ass'n,* 191 Conn. 282, 465 A.2d 294, 303 (1983); *Teh Len Chu v. Fairfax Emergency Medical Associates,* 223 Va. 383, 290 S.E.2d 820, 822 (1982) (per curiam).

that this instruction is seemingly inconsistent and confusing to a jury, since the word "mistake" in itself implies *deviation from a code of behavior.*[62] Although we recently affirmed in *Boyanton*[63] the use of the mistake-of-judgment instruction, we were there urged to decide that a specialist's mistake in judgment should be the equivalent of negligence per se. We declined to do so, recognizing that *an error in judgment is not necessarily negligence. Implicit in that decision* was the notion that the *Boyanton evidence supported a mistake-of-judgment instruction.*

We need not reach today the broader question whether mistake-of-judgment instructions should be condemned. It suffices to say *the instruction given in this case was unwarranted with respect to both the mother's and the wrongful death claims.* The doctors contended at trial that they *did not interpose* the mistaken judgment defense as part of their negation of negligence.[64] There was no proof that any of them had the choice of several alternatives, equally acceptable medically, and elected one which later proved to be less effective than another might have been. Rather a contest ensued at *nisi prius* over the *applicable standard for the acceptable level of care.* The mother argued that the standard required that Rho–GAM be given *even if* 72 hours had elapsed after the miscarriage or the D & C. The doctors contended that the standard called for Rho–GAM to be given, if at all, within 72 hours of the miscarriage. The *controversy over skills' standard* was not the right

context for a mistake-of-judgment instruction, which is proper solely for *alternative-treatment* cases—to guard against the imposition of professional liability for acts or omissions that are *not in breach of the skills' standard.* In short, a mistake-of-judgment defense was not interposed below and its inclusion in the instructions was error.

## B.

### THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY INSTRUCTING ON MISTAKE OF JUDGMENT ALTHOUGH THE EVIDENCE DID NOT WARRANT IT

■ The test to be used when reviewing an instruction improperly given is whether there is a probability that it misled the jurors and caused them to reach a result different from that which they would have reached but for the flawed jury charge.[65] Among the defenses asserted by the doctors in negation of the mother's claim of negligence were the "72–hour" theory, which we have explained, and "the blighted ovum" theory.[66] Dr. Keuchel testified that (1) the mother carried a "blighted ovum," rather than a more developed fetus when she miscarried in January 1982 and (2) there was no need for Rho–GAM because a blighted ovum does not develop sufficiently to cause sensitization. *Although neither of these defenses rises to a mistake of judgment, Dr. Keuchel's testimony may have appeared to cast them in that legal garb.*[67] He made at least four

62. *Rogers, supra* note 61, 772 P.2d at 933.

63. *Boyanton v. Reif,* Okl., 798 P.2d 603 (1990).

64. Counsel for Drs. Keuchel, Loerke and Benien Clinic told the jury in the closing argument that the dispute over whether Rho–GAM should have been given even if 72 hours had elapsed *was not their defense.* Counsel later *read the contested charge to the jury* and told them that *the mistake-of-judgment instruction in connection with the 72 hours was not part of their defense.* (Trial transcript at 1626–1627.)

65. *Woodall, supra* note 57 at 654.

66. *See supra* note 19.

67. We do not suggest Dr. Keuchel's counsel improperly sought to influence the jury's verdict.

Although counsel's conduct may have been inadvertent, its effect—coupled with the unwarranted instruction—was prejudicial.

Dr. Keuchel was asked if it would be improper medical practice to allow a mother to become sensitized as a result of a physician's failure to give Rho–GAM. His first response was, "if it happened, [his] *judgment would have been wrong.*" Although the question was asked again and an affirmative response finally elicited, the idea that it was a mistake of judgment had been implanted in the jurors' minds.

Later Dr. Keuchel testified that a reason he did not give her Rho–GAM was that "I knew in my mind, *my judgment,* . . . that it was a blighted ovum." He later explained that he did not give Rho–GAM because it was "past the 72 hours, based on *[his] judgment* of when she

references to having used his judgment in deciding not to give the mother Rho–GAM.

Defense counsel *read the challenged instruction to the jury during his closing argument, telling the triers that it was not a part of the doctors' defense.*[68] Rather than erasing the taint of Dr. Keuchel's frequent references to a use of his judgment, it is probable that this *emphasis on the instruction would cause even more confusion.* Since the judge had included mistake of judgment in his instructions, we have no doubt that the jury was misled, particularly since the challenged language was given without definition or explanation.[69] There is a strong probability that the jury reached a result different from that which it would have reached but for the flawed jury charge; we must hence reverse the judgment on the mother's bodily injury claim and remand the action for a new trial.

## III

## ISSUES THAT MAY ARISE UPON RETRIAL

### A.

### BIFURCATION OF THE CLAIMS IS REQUIRED TO ASSURE THAT THE JURY DOES NOT IMPUTE THE MOTHER'S ORDINARY NEGLIGENCE TO THE CHILD

 When the jury returned with a verdict, it had completed *only one verdict form*—i.e., *that on the mother's claim.*

The trial court sent · the triers back for further deliberations. The jury later sent out a note:

"For any *negligence* to come into play, does there have to be a ruling in favor of the *plaintiff?*" [Emphasis supplied.] (Trial transcript at 1669).

The jury's question to the judge suggests that the triers had *less than a crystal-clear understanding of the issues to be decided in the wrongful death claim.*[70] Their confusion illustrates the problems inherent in *combining for trial two completely separate claims against common defendants,* where one is a *parent's medical malpractice claim founded on negligence* and the other is for *injury to or wrongful death of a child.* The very same problems came to be encountered in *Strong.*[71] *When such claims are tried together, it is virtually impossible to assure that the parent's contributory negligence will be surgically excised from courtroom proceedings.*

On retrial the *nisi prius* court must bifurcate[72] the trial of the wrongful death claim and that of the mother's bodily harm claim to avoid jury confusion and assure that the triers do not impute the mother's contributory negligence to the child. The wrongful death claim should first proceed to a verdict, to be followed sequentially by trial of the mother's bodily injury claim *to the same jury, or the claims should be tried separately to different juries, as judicial discretion may dictate.* This procedure will ensure that, in the trial of the

---

started bleeding ... [his] *judgment* told [him] it was past 72 hours, which was the standard of care in [his] estimation at that time, in the United States."

Counsel for the mother added to the confusion by asking (1) "If it was not a blighted ovum, then you were *mistaken about that judgment;* weren't you?" and (2) "if it was not past 72 hours, then you were *incorrect in the making of that judgment;* weren't you?" (Trial transcript 320, 390–392.)

**68.** *See supra* note 64.

**69.** For the text of the mistake-of-judgment instruction, *see supra* note 58.

**70.** The judge reinstructed the jury and returned them for further deliberations. (Trial transcript

at 1669–70). Plaintiffs requested a mistrial, which was denied. When the jury is directed to return for deliberations and reread the instructions, it is presumed they followed those instructions. *Bateman v. Glenn,* Okl., 459 P.2d 854, 858 (1969). *Because we reverse both claims on different grounds; we need not decide whether a mistrial should have been granted.*

**71.** *See Strong, supra* note 27 at 371. ·

**72.** *See* 12 O.S.Supp.1984 § 2018, which governs bifurcation; it provides in pertinent part:

"D. SEPARATE TRIALS. The *court ... to avoid prejudice ... may order a separate trial of any claim ...* always preserving inviolate the right of trial by jury." [Emphasis supplied.]

death claim, the mother's contributory negligence is kept out of the jury's consideration.

## B.

## SINCE IN THE MOTHER'S CLAIM THERE WAS AT LEAST SOME EVIDENCE OF HER CONTRIBUTORY NEGLIGENCE, A CONTRIBUTORY NEGLIGENCE INSTRUCTION SHOULD HAVE BEEN GIVEN

■■■ The doctors urged the mother should have told them she had Rh-negative blood and that she had been given Rho–GAM in the past. According to the mother, even if she had a duty to volunteer this information and failed to do so, her silence could not, as a matter of law, be the proximate cause of her injuries. The mother contends that the evidence did not support an instruction on contributory negligence because the doctors had an independent duty to test her blood or find out her blood type from the hospital records of an earlier pregnancy. The mother urges that just as a principal who bears a non-delegable duty remains liable for a tort committed by an independent contractor,[73] the doctors may not shift to her their duty to test her blood. This analogy is not entirely correct; the doctors have not tried to escape liability by delegating a duty to an independent contractor. The defense of contributory negligence does not even arise unless the defendant has been *guilty of negligence which, but for this defense, would render it lia-*

*ble to the plaintiff.*[74] *The jury would have to decide that the doctors were negligent before it could find that the mother was contributorily negligent.*

Oklahoma constitutional[75] and statutory law[76] provide that the defense of contributory negligence shall *always* be a question of fact and must be left to the jury *in all cases.* For a trial court to take contributory negligence away from the jury, there must be a *complete lack of contributory negligence evidence.*[77]

The mother did not remember whether she told the doctors that she has Rh-negative blood or had received Rho–GAM in the past. She admitted it was *probable* that she had *not* told them. The evidence shows that the mother knew her blood type and had been told earlier about the importance of receiving Rho–GAM. Several doctors and nurses testified that they would expect a patient to *volunteer this vital information, even if not asked.* Dr. Loerke testified that if the mother *had* advised someone she was Rh-negative, action would have been taken. It was hence for the jury to decide whether, under the particular circumstances surrounding the critical events unfolded below, failure to disclose this vital information was a patient's contributory negligence.[78]

Proximate cause is but an *element* of contributory negligence; the issue must be left to the jury *where the facts are disputed,* as they are in the case here for re-

---

73. The mother cites *Jack Cooper Transport Company, Inc. v. Griffin,* Okl., 356 P.2d 748, 754 (1960); *Shell Pipe Line Corporation v. Curtis,* Okl., 287 P.2d 681, 685 (1955) and *Minnetonka Oil Co. v. Haviland,* 55 Okl. 43, 155 P. 217, 218–219 (1916).

74. *Miller v. Price,* 168 Okl. 452, 33 P.2d 624, 627 (1934).

75. Art. 23, § 6, Okl. Const., provides:
"The defense of contributory negligence or of assumption of risk shall, *in all cases whatsoever,* be a question of *fact,* and *shall, at all times, be left to the jury.*" [Emphasis supplied.]

76. 23 O.S.1981 § 12 provides:
"The defense of contributory negligence or of assumption of risk shall, *in all cases whatso-*

*ever,* be a question of fact, and *shall at all times be left to the jury,* unless a jury is waived by the parties." [Emphasis supplied.]

77. Art. 23, § 6, Okl. Const.; 23 O.S.1981 § 12; *Bullard v. Grisham,* Okl., 660 P.2d 1045, 1048 (1983).

78. Other jurisdictions have held that evidence of a patient's failure to reveal certain information which would have been helpful to her physician forms a jury issue under the rubric of contributory negligence—*especially where the evidence also showed that the patient may have been advised of the importance of this information. See* Patient's Failure To Reveal Medical History To Physician As Contributory Negligence Or Assumption Of The Risk in Defense Of Malpractice Action, Anno, 33 A.L.R.4th 790 § 3 (1984).

view.[79] The trial court did not err by submitting contributory negligence[80] to the jury under an instruction that allowed the jury to find for the defendants on any of the theories supported by the evidence.[81]

## C.

## THE INSTRUCTIONS AS A WHOLE SUFFICIENTLY INFORM THE JURY OF THE DOCTORS' BURDEN TO PROVE CONTRIBUTORY NEGLIGENCE; UPON RETRIAL THE JURY MUST BE INSTRUCTED THAT THE MOTHER'S NEGLIGENCE MAY BE COMPARED WITH THE DOCTORS' GROSS NEGLIGENCE, IF ANY; IF THE JURY SHOULD FIND THE DOCTORS' CONDUCT TO BE WILLFUL AND WANTON, IT MAY NOT USE THE EXTENT OF HARM OCCASIONED BY THAT BEHAVIOR TO ASSESS FAULT

■ The mother claims error in the trial court's failure to give a separate instruction on the doctors' *burden to prove* that the mother was contributorily negligent, but she has not provided a record which shows that a separate burden-of-proof instruction for contributory negligence was requested.[82] When the trial court instructs generally on the issues and a party wants a more specific instruction, it must be requested.[83] Otherwise the error is waived.[84]

■ Although an instruction that the burden of proof is upon the defendant to establish his allegation of the plaintiff's contributory negligence by a preponderance of the evidence is correct as an abstract statement of the law,[85] such instruc-

---

79. *Thompson, supra* note 21 at 263.

80. The doctors requested that the trial court give an *assumption of the risk* instruction based upon (1) the mother's failure to tell the doctors that she was Rh negative and had received Rho–GAM before and (2) her failure to get a blood test to find out if she had been sensitized *after* Dr. Keuchel had told her that she did not receive Rho–GAM following the 1982 miscarriage; the trial court properly refused such an instruction. *There was no evidence that the mother consented to the doctors' failure to give her Rho–GAM.*

The defenses of *assumption of the risk* and *contributory negligence,* although closely allied, are *conceptually distinguishable.* While they sometimes arise under the same set of facts and hence occasionally overlap each other, *they are founded on separate and distinct principles of law. See Kleppe v. Prawl,* 181 Kan. 590, 313 P.2d 227, 230–231 (1957); *White v. McVicker,* 216 Iowa 90, 246 N.W. 385, 386 (1933); *Watterlund v. Billings,* 112 Vt. 256, 23 A.2d 540, 543 (1942) and *Landrum v. Roddy,* 143 Neb. 934, 12 N.W.2d 82, 89 (1943).

Contributory negligence is the product of negligence law whose source is traceable to *Butterfield v. Forrester,* 103 Eng.Rep. 926 (K.B.1809). Assumption of the risk, on the other hand, had crystallized *much earlier* in the form of the maxim *volenti non fit injuria*—one who voluntarily exposes himself to a known, appreciated and avoidable danger may not recover for injuries occasioned by the exposure. It reflects the Roman law's notion of legal wrong or *injuria.* The principle embodied in the maxim is that a loss inflicted by one's *voluntary act or submission* is not actionable. Dig. 47, 10, 1, 5 (*Quia nulla injuria est, quae in volentem fiat*); *see* Burdick, Principles of Roman Law, p. 504 (1938). The *volenti* doctrine is expressed as a common-law rule both in *Cruden v. Fentham,* 2 Esp. 685, 170 Eng.Rep. 496 (1799) and *Priestley v. Fowler,* 3 M. & W. 1, 150 Eng.Rep. 1030, 1031–1033 (1837) (a master and servant case where the *volenti* defense is believed to have received its greatest impetus). *See* Prosser and Keeton, The Law of Torts, § 68, p. 480 (5th Ed.1984).

The defense of *assumption of risk* is relatively new to the common law. *Cruden, supra,* is the first clearly distinguishable application of the doctrine. *The typical case of risk assumption draws either from a status relation or a contract between the parties.* Assumption of the risk clearly is not applicable to this case. *Thomas v. Holliday,* Okl., 764 P.2d 165, 167–170 (1988).

81. The trial court is *required* to instruct the jury on the theories *supported by the evidence. Knight v. Estes,* Okl., 383 P.2d 879, 883 (1963); *Bottoms v. Botts,* Okl., 349 P.2d 653, 658 (1960).

82. Although the mother objected to *nisi prius* submission of the contributory negligence issue to the jury, she *requested* the burden of proof instruction that was given.

83. *Timmons v. Royal Globe Ins. Co.,* Okl., 653 P.2d 907, 915 (1982).

84. *Hames v. Anderson,* Okl., 571 P.2d 831, 833 (1977).

85. *G.A. Nichols Co. v. Lockhart,* 191 Okl. 296, 129 P.2d 599 (1942).

tions have been criticized as incomplete and misleading.[86]

The burden-of-proof instruction given below was a general one—i.e., it was not limited to the *mother's* burden to prove negligence,[87] but was cast in terms of a *party's* duty. Although it did not *specifically* instruct that the *doctors had the burden to prove contributory negligence,* the instructions, considered together, *clearly and correctly stated the law applicable to contributory and comparative negligence.*[88]

The jury was told that the phrase "if you find" was equivalent to saying that a certain party had the burden of proof on that issue.[89] The triers were instructed they must be persuaded by the evidence that the proposition on which a party had the burden of proof was "more probably true than not true."[90] *The key language "if you find" was used in the instruction on the mother's contributory negligence*[91]— *clearly indicating that the doctors and hospital had the burden of proof on that proposition.* The trial court submitted correct definitions of both "negligence" and "ordinary care."[92] The jury was instructed that contributory negligence means the negligence of the mother.[93]

**86.** *See e.g., Norton v. Harmon,* 192 Okl. 36, 133 P.2d 206, 211 (1943) and *St. Louis–S.F. Ry. Co. v. Schmitz,* 116 Okl. 60, 243 P. 225 (1926), decided before comparative negligence was introduced into our law.

With the passage of our comparative negligence statutes, 23 O.S.1981 §§ 13 and 14, *contributory negligence is no longer a complete bar to recovery.* The trial court gave the OUJI instructions and verdict forms for contributory and comparative negligence. *These instructions adequately explain to the jury the law of contributory and comparative negligence* and clothe the plaintiff with the presumption of having used due care even *without a separate instruction on the burden of proving contributory negligence.*

**87.** Instruction 11 states:
"A party claiming damages has the burden of proving each of the following propositions:
First, that he has sustained injury;
Second, that the party from whom he seeks to recover was negligent;
And, third, that such negligence was a direct cause of the injury sustained by the claiming party."

**88.** *See Karriman, supra* note 57 at 538; *Knight, supra* note 81 at 881–82.

**89.** Instruction 10 states:
"In a civil lawsuit, such as this one, there are requirements as to which party is to prove to you certain things. This is called "Burden of Proof." When I say that a party has the burden of proof on any proposition, or use the expression "if you find," or "if you decide," I mean that you must be persuaded, considering all the evidence in the case, that the proposition on which such party has the burden of proof is more probably true than not true."

**90.** *See* Instruction 10, *supra* note 89.

**91.** Instruction 32 states:
"With respect to the claim of Katrina Graham, *if you find* the occurrence with which this lawsuit is concerned was *directly caused by the contributory negligence of the plaintiff Katrina Graham* and not by any negligence on the part of either defendant Dunaway, Loerke, Keuchel or Oklahoma Osteopathic Hospital, or if you find that the Plaintiff Katrina Graham has failed to proved that either defendant Dunaway, Loerke, Keuchel or Oklahoma Osteopathic Hospital was negligent, or that the statute of limitations had expired, then you shall use the Pink Verdict Form and find in favor of that, one or more, defendant." [Emphasis supplied.]

**92.** Instruction 12 states:
"Since this lawsuit is based on the theory of negligence, you must understand what the terms 'negligence' and 'ordinary care' mean in the law with reference to this case.
*'Negligence' is the failure to exercise ordinary care to avoid injury to another's person or property. 'Ordinary care' is the care which a reasonably careful person would use under the same or similar circumstances.* The law does not say how a reasonably careful person would act under those circumstances. That is for you to decide. Thus, under the facts in evidence in this case, if a party failed to do something which a reasonably careful person would do, or did something which a reasonably careful person would not do, such party would be negligent." (Emphasis supplied.)

**93.** Instruction 29 states:
"With respect to the individual claim of Katrina Graham only, under the law you are to compare the percentage (0%–100%) of negligence of the plaintiff Katrina Graham, if any, with the percentage (0%–100%) of negligence of the defendants Dunaway, Loerke, Keuchel and Oklahoma Osteopathic Hospital, if any. The law provides that *contributory negligence, which means the negligence of the plaintiff,* shall not bar recovery of damages unless such negligence of the plaintiff Katrina Graham is of a greater degree, established by percentage,

When all of the contributory and comparative negligence instructions are read together, it is clear that the jury was given a correct statement of the applicable law, *except for one important omission.* The trial court *did not explain* to the triers what, if any effect, the mother's evidence of defendants' *gross negligence* had upon the assessment of fault within the comparative negligence framework.

At common law, contributory negligence is a defense against ordinary negligence, but not against gross negligence or willful or wanton misconduct.[94] With the advent of comparative negligence a number of jurisdictions have modified the common law to allow jury comparison of a plaintiff's ordinary negligence with a defendant's gross negligence.[95] In *Morris v. Sorrells* [96] we left unaddressed the issue whether the

Oklahoma common-law norm should now be modified.[97] Since a definitive answer to the modification question is *critical to a complete resolution of the issues now before us,*[98] the time for decision has come.

Oklahoma has adopted "modified" comparative negligence. 23 O.S.1991 §§ 13, 14.[99] A negligent plaintiff may recover part of his damages if defendant's negligence is established *unless his fault is greater than that of the defendant.*[100] Where there are multiple defendants, as is the case here, fault may be apportioned among them; each codefendant may be liable for that proportion of the damages attributable to his own substandard conduct.[101] With the advent of comparative negligence, a jury need not, as before, rely solely upon the broad statutory categorizations [102] of "ordinary negligence" and

> than the total combined negligence of the defendants causing the damage.
> The percentage (0%–100%) of negligence you find for each party should be stated in the appropriate verdict form. The verdict forms have been color-coded to assist you." [Emphasis supplied.]

**94.** *See,* e.g., *Vaughn v. Baxter,* Okl., 488 P.2d 1234, 1237 (1971); *Conner v. Burdine,* 120 Okl. 20, 250 P. 109, 110 (1926).

**95.** *Wyoming permits comparative negligence as a defense against gross negligence but not against willful and wanton misconduct or intentional acts. For a well-reasoned opinion, see Danculovich v. Brown,* 593 P.2d 187, 192–194 *(Wyo.1979). Compare Billingsley v. Westrac Company,* 365 F.2d 619, 621–623 (8th Cir.1966) (applying Arkansas law), which permits the jury to compare *a plaintiff's ordinary negligence* with a *defendant's willful and wanton misconduct. See also Amoco Pipeline Co. v. Montgomery,* 487 F.Supp. 1268, 1271 (W.D.Okla.1980) (applying Oklahoma law), where a federal court forecast that Oklahoma would adopt the Arkansas approach and APPLICATION OF COMPARATIVE NEGLIGENCE IN ACTION BASED ON GROSS NEGLIGENCE, RECKLESSNESS, OR THE LIKE, ANNOT., 10 A.L.R.4TH 946 (1981).

**96.** Okl., 837 P.2d 913 (1992).

**97.** The common law forms a "dynamic and growing" body of rules that change with the conditions of society and hence may be modified from time to time. *Brigance, supra* note 47 at 303, quoting *McCormack v. Oklahoma Pub. Co.,* Okl., 613 P.2d 737, 740 (1980). *See also Vanderpool v. State,* Okl., 672 P.2d 1153, 1157 (1983).

**98.** On appeal this court will not pass upon issues or questions not raised by the pleadings, not presented to, and passed upon by the trial court *unless it is, critical to a complete resolution of the issues before it. Von Stilli v. Young,* 203 Okl. 86, 219 P.2d 224 (1950).

**99.** The terms of 23 O.S.1991 § 13 provide:
> In all actions hereafter brought, whether arising before or after the effective date of this act, for negligence resulting in personal injuries or wrongful death, or injury to property, *contributory negligence shall not bar a recovery, unless any negligence of the person so injured, damaged or killed, is of greater degree than any negligence of the person, firm or corporation causing such damage,* or unless any negligence of the person so injured, damaged or killed, is of greater degree than the combined negligence of any persons, firms or corporations causing such damage. [Emphasis supplied.]
> The terms of 23 O.S.1991 § 14 provide:
> Where such contributory negligence is shown on the part of the person injured, damaged or killed, the *amount of the recovery shall be diminished in proportion to such person's contributory negligence.* [Emphasis supplied.]

**100.** *See* 23 O.S.1991 §§ 13, 14 *supra* note 99.

**101.** *Laubach v. Morgan,* Okl., 588 P.2d 1071, 1074 (1978). Our modified version is distinguishable from the "pure" form of comparative negligence. The latter allows a plaintiff to recover all his damages—*regardless of the percentage of his fault. Laubach, supra* at 1072 n. 2.

**102.** The terms of 25 O.S.1991 § 5 provide:
> There are *three degrees of negligence,* namely, *slight, ordinary and gross.* The latter includes the former. [Emphasis supplied.]

"gross negligence" to decide liability;[103] rather it may *attribute exact percentages of fault to each party.*

We think the better practice today would be to place gross negligence under the same rubric as ordinary negligence for *the limited purpose of allowing the jury's comparison of the parties' responsibility for the total harm.*

*The same apportionment of fault into percentage figures becomes impermissible once a defendant's behavior has been established as willful and wanton misconduct.* While "ordinary" and "gross" negligence differ in *degree,* "negligence" and "willful and wanton misconduct" differ in *kind.*[104] We cannot read into our comparative negligence regime an abrogation of the common law's dichotomous division of *actionable tortious conduct* into (1) *negligence* and (2) *willful acts that result in intended or unintended harm.* The *intent* in *willful and wanton misconduct* is *not* an *intent to cause the injury;* it is an *intent to do an act*—or the failure to do an act—in reckless disregard of the consequences and *under such circumstances that a reasonable man would know,* or have reason to know, *that such conduct would be likely to result in substantial harm to another.*[105] *The jury may not measure "wantonness" and then translate its percentage into a degree of negligence. Contributory negligence may not be compared either to preclude or reduce a plaintiff's recovery where the defendant's conduct is willful or wanton.*[106]

Gross negligence—*for application of the comparative negligence statute*—is substantially higher in magnitude than simple inadvertence, but *falls short of the intentional wrong's equivalent.*[107] Gross negligence may be deemed equivalent [108] of willful and wanton misconduct for punitive damages assessment when it demonstrates such a total disregard of another's rights that it may be equated with evil intent or implies such entire want of care or recklessness of conduct that it (a) can be likened to positive misconduct or (b) evinces a conscious indifference to predictable adverse consequences.[109]

Where, as here, the facts are disputed, or where undisputed facts would support opposite inferences with respect to whether an actor was (a) grossly negligent in the

---

The terms of 25 O.S.1991 § 6 provide:
Slight negligence consists in the want of great care and diligence; ordinary negligence in the want of ordinary care and diligence; and *gross negligence in the want of slight care and diligence.* [Emphasis supplied.]

**103.** The theory that there are *three degrees of negligence*—described by the terms *slight, ordinary, and gross*—was introduced into our jurisprudence from *Roman Law;* its *earliest application* was in the law of *bailments. Steamboat New World et al. v. King,* 57 U.S. 469, 16 How. 469, 474, 14 L.Ed. 1019 (1853). For early criticism of the terms, *see Steamboat, supra* at 474–475.

**104.** Prosser & Keeton, THE LAW OF TORTS, Ch. 5, § 34, p. 212 (5th Ed.1984); RESTATEMENT (SECOND) OF TORTS, *supra* note 30 at § 500, Comment g, 590.

**105.** *Mitchell v. Ford Motor Credit Co.,* Okl., 688 P.2d 42, 45–46 (1984); *Wootan v. Shaw,* 205 Okl. 283, 237 P.2d 442, 444 (1951).

**106.** *See supra* note 94.

**107.** 25 O.S.1991 § 6, *supra* note 102; 25 O.S. 1991 § 3; 25 O.S.1991 § 4; *Mitchell, supra* note

105 at 46 n. 9; *Wootan, supra* note 105, 237 P.2d at 444. The terms of 25 O.S.1991 § 3 are:

"There are three degrees of care and of diligence, namely, *slight, ordinary and great.* The latter includes the former." [Emphasis supplied.]

The terms of 25 O.S.1991 § 4 are:
"*Slight care* or diligence is such as persons of ordinary prudence usually exercise about their *own affairs of slight importance;* ordinary care or diligence is such as they usually exercise about their *own affairs of ordinary importance;* and *great care* or diligence is such as they usually exercise about their *own affairs of great importance.*" [Emphasis supplied.]

For a comparison of *gross negligence* with a *willful or intentional wrong, see Altman v. Aronson,* 231 Mass. 588, 121 N.E. 505, 506 (1919).

**108.** *See, e.g., Fox v. Oklahoma Memorial Hospital,* Okl., 774 P.2d 459, 461 (1989), where we explained that negligence can be so *flagrant,* so *deliberate,* or so *reckless* that it is removed from the realm of mere negligence and *transmuted into willful and wanton misconduct.*

**109.** *Mitchell, supra* note 105 at 46 n. 9; *Wootan, supra* note 105, 237 P.2d at 444.

§ 6 sense [110] or (b) guilty of willful or wanton conduct, the jury should be instructed that if it found the actor's conduct to be of the latter category, *it may not consider the extent of harm occasioned by that conduct in apportioning fault.*

*In sum, the jury must be instructed that while ordinary negligence of the plaintiff may be used as a defense against gross negligence, it may not be considered as a defense against any form of conduct found to be willful and wanton or intentional.* As for punitive damages, they present an entirely separate consideration, governed by 23 O.S.1981 § 9.[111] *They are unrelated to a plaintiff's conduct. In sum, punitive damages' assessment remains unaffected by interposition of contributory negligence.*[112]

### D.

### THE EVIDENCE WARRANTED A PUNITIVE DAMAGES INSTRUCTION

██ It is urged that the *nisi prius* court applied the wrong standard of proof when it wrested punitive damages from the jury.[113] Oklahoma's punitive damage statute, 23 O.S.Supp.1986 § 9,[114] was amended in 1986 to require *clear and convincing* evidence *when punitive damages in excess of actual damages are sought.* The old standard of preponderance, which requires some evidence of fraud, oppression, malice or reckless disregard of another's rights, still governs *where the quantum of punitive damages sought does not exceed that of the actual damages.*[115] Punitive damages in excess of actual damages were not sought below.[116] *The trial judge should not have used the higher clear-and-convincing standard when he considered whether to submit punitive damages to the jury;*[117] *he should have instructed on punitive damages—limiting recovery to the same amount as that for actual damages—if there was a showing of "some element" of fraud, malice or reckless disregard of the mother's rights.*[118]

Punitive damages are allowable when there is evidence of reckless and wanton disregard of another's rights from which malice and evil intent may be inferred.[119] Oppressive intent may also be inferred from "complete indifference to conse-

110. 25 O.S.1991 § 6, *supra* note 102.

111. 23 O.S.1991 § 9, *infra* note 114.

112. *See* Effect of Plaintiff's Comparative Negligence in Reducing Punitive Damages Recoverable, Annot., 27 A.L.R. 4th 318 (1984).

113. *Where no actual damages are awarded,* the trial court's failure to submit a punitive damage instruction is *not reversible error. Eckels v. Traverse,* Okl., 362 P.2d 680, 683 (1961). We address the issue here because this cause is *remanded on other grounds.*

114. 23 O.S.Supp.1986 § 9 provides in pertinent part:
"A. In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of conduct evincing a wanton or *reckless disregard for the rights of another,* oppression, fraud or malice, actual or presumed, the jury, in addition to the actual damages, *may give damages* for the sake of example, and by way of punishing the defendant, *in an amount not exceeding the amount of actual damages awarded.* Provided, however, if at the conclusion of the evidence and prior to the submission of the case to the jury, the court shall find, on the record and out of the presence of the jury, that there is clear

and convincing evidence that the defendant is guilty of conduct evincing a wanton or reckless disregard for the rights of another, oppression, fraud or malice, actual or presumed, then the jury may give damages for the sake of example, and by way of punishing the defendant, and the percentage limitation on such damages set forth in this section shall not apply." [Emphasis supplied.]

115. *See* 23 O.S.Supp.1986 § 9, *supra* note 114; *Hamilton v. Amwar Petroleum Co., Inc.,* Okl., 769 P.2d 146, 149 (1989); *Slocum v. Phillips Petroleum Co.,* Okl., 678 P.2d 716, 719 (1983).

116. This suit was filed before the 1986 amendment became effective, but *damages in a quantum that would exceed actual damages have never been sought.* (Trial Transcript at 1086.) We need not reach the issue whether the 1986 amendment applies to this claim.

117. The trial judge stated he could *not* conclude there was *clear and convincing evidence* of oppressive or reckless and wanton conduct by the defendants. (Trial transcript, 1086.)

118. *See supra* note 115.

119. *Mitchell, supra* note 105 at 45.

quences," "conscious or reckless disregard of the safety of others," or "gross negligence."[120]

The proof adduced at trial does tend to show, among other things: (1) it is standard procedure for doctors to determine a pregnant patient's blood type and Rh-factor, (2) the mother's blood was never typed during the entire course of treatment for her pregnancy and miscarriage, (3) withholding Rho–GAM from a woman who is a candidate for it is *"considered malpractice virtually ipso facto, regardless of who seems to be at fault"* and (4) hemolytic disease is "overwhelmingly preventable." An expert witness testified that the doctors' behavior towards the mother showed complete disregard for the patient's welfare. This, and other evidence in the record, indicates that three doctors and a hospital, any of whom could and should have been concerned with the mother's Rh-factor, never even considered it. The jury could conclude from the evidence presented that the doctors were indifferent to the consequences of their actions or demonstrated a reckless disregard for their patient's rights. *This evidence would support submission to the jury of punitive damages with an appropriate limitation on the quantum that might be awarded.*

## IV

### THE DOCTORS' COUNTER–APPEAL

#### A.

#### THE TRIAL COURT DID NOT ERR BY REFUSING TO DIRECT A VERDICT FOR THE DEFENDANTS ON THE WRONGFUL DEATH CLAIM

#### 1.

#### VIABILITY AT THE TIME OF THE NEGLIGENT ACT IS NOT REQUIRED IN WRONGFUL DEATH ACTIONS BROUGHT ON BEHALF OF BABIES BORN ALIVE

■ The doctors press as error the trial court's failure to dismiss the wrongful death action or direct a verdict in their favor. They contend that *Evans v. Olson*[121] teaches that *unless a fetus is viable when the negligence occurs,* a wrongful death action will not lie. This reading of *Evans* is overbroad. We recognized in *Evans* a common-law negligence action for a surviving child who had suffered prenatal injury and held that a wrongful death action may be maintained *for a viable fetus which is stillborn.*[122] We noted with approval the notion that *damages should be recoverable for a person's wrongful conduct which interferes with a child's right to begin life with a sound mind and body; competent proof must establish the causal connection between the wrongful interference and the harm suffered by the child when born.*[123] *Evans* does not require that this wrongful death action be dismissed. This case deals with a child born alive—not with a stillborn baby.

#### 2.

#### THE FACT THAT DOCTORS' NEGLIGENCE MAY HAVE PRECEDED CONCEPTION IS NO IMPEDIMENT TO RECOVERY FOR THE CHILD'S WRONGFUL DEATH SINCE THE DIRECT CAUSAL CONNECTION BETWEEN FAILURE TO GIVE AN RH–NEGATIVE MOTHER RHO–GAM AND A NEWBORN'S DEATH FROM EBF IS CLEAR

■ The doctors argue that they are shielded from liability because the negligence that caused Donald's death took place before his conception. They point to *Albala v. City of New York,*[124] where the

**120.** *Mitchell, supra* note 105 at 45 n. 8; *Sunray DX Oil Co. v. Brown,* Okl., 477 P.2d 67, 70 (1970).

**121.** Okl., 550 P.2d 924, 928 (1976).

**122.** *Evans, supra* note 121 at 927.

**123.** *Evans, supra* note 121 at 929. *See Smith v. Brennan,* 31 N.J. 353, 157 A.2d 497, 503 (1960);

*see also Womack v. Buchhorn,* 384 Mich. 718, 187 N.W.2d 218, 220 (1971).

**124.** 54 N.Y.2d 269, 445 N.Y.S.2d 108, 108–110, 429 N.E.2d 786, 787–788 (App.1981). *See also Walker v. Rinck,* 566 N.E.2d 1088, 1089–90 (Ind. App.1991), where the court adopted *Albala's* reasoning in a Rho–GAM case. *Walker* was criti-

court fashioned a *blanket rule* against recovery for injuries that arise from *negligence that occurred before conception.* *Albala* was concerned with problems of proof and proximate causation. No similar impediment exists in this case—i.e., the direct causal connection between failure to prevent sensitization and the subsequent birth of the child with fatal condition is crystal clear.[125]

The trial court did not err by ruling that the child's [126] common-law claim and hence the parents' statutory wrongful death claim were both actionable.[127] Three elements are essential to prove negligence: 1) a duty owed by the defendant to protect the plaintiff from harm, 2) a failure by the defendant to properly perform the duty, and 3) injuries that are the direct result of the defendant's failure to properly perform the duty.[128]

One of Rho–GAM's purposes is to prevent harm to future children by keeping the mother from becoming sensitized.[129] Doctors have a duty to administer the drug in a proper case—not only to protect the mother—but also to protect those who, although unconceived at the time of her treatment, are anticipated and foreseeable.[130] The trial court did not err by finding, in essence, that the injury to Donald was within the zone of danger that Rho–GAM was designed to guard against; *nisi prius* refusal to direct a verdict for the doctors based upon their lack of legal duty was not error.

The trial court decided correctly that causation was a question of fact for the jury.[131] Evidence shows that (1) failure to give Rho–GAM to an RH-negative mother can cause sensitization, (2) the doctors

cized in *Yeager v. Bloomington Obstetrics,* 585 N.E.2d 696 (Ind.App.1992). *See infra* note 125.

**125.** Some jurisdictions consider foreseeability decisive of whether a negligent actor *owes a duty to children who are unconceived at the time of his substandard conduct. See Renslow v. Mennonite Hospital,* 67 Ill.2d 348, 10 Ill.Dec. 484, 367 N.E.2d 1250, 1253 (1977), where an *Rh-negative teenage girl* was transfused with *Rh-positive blood.* Years later a child was born prematurely with severe and permanent neurological injury *as a result of the mother's sensitization.* The court noted that the basic understanding of Rh-negative and Rh-positive effects upon hemolytic disease of the newborn had been a *medical fact* since the *1940's.* The negligence was actionable since *defendants could foresee that (1) the substandard conduct could harm a later-conceived child and (2) the young woman could bear children. See also Jorgensen v. Meade Johnson Laboratories, Inc.,* 483 F.2d 237 (10th Cir.1973); *Yeager,* supra note 124; *Monusko v. Postle,* 175 Mich.App. 269, 437 N.W.2d 367 (1989), appeal den., 433 Mich. 869 (1989); Liability For Child's Personal Injuries Or Death Resulting From Tort Committed Against Child's Mother Before Child Was Conceived, Annot., 91 A.L.R.3d 316 (1979); H. Robertson, Injury to the Unborn, 1978 Duke Law Journal 1401, 1435; Prosser and Keeton, The Law of Torts, § 55 (5th Ed.1984).

For cases holding that a *motorist* has *no duty* to a child who is not yet conceived at the time of an *automobile accident, see McAuley v. Wills,* 251 Ga. 3, 303 S.E.2d 258, 259 (1983) and *Hegyes v. Unjian Enterprises, Inc.,* 234 Cal.App.3d 1103, 286 Cal.Rptr. 85 (1992), reh'g. den. (1991).

**126.** 12 O.S.1981 § 1053 A provides:

"When the death of one is caused by the wrongful act or omission of another, *the personal representative of the former may maintain an action therefor against the latter,* or his personal representative if he is also deceased, *if the former might have maintained an action had he lived, against the latter,* or his representative, for an injury for the same act or omission. The action must be commenced within two (2) years." [Emphasis supplied.]

**127.** A valid common-law action must have arisen in favor of the decedent before a wrongful death action will lie. *Evans,* supra note 121 at 927; *Haws, supra* note 33; *Hill, supra* note 33 at 37.

**128.** *Thompson, supra* note 21 at 263.

**129.** The mother's interest in having safe pregnancies and healthy children is also protected, but the health of unconceived children is clearly a *primary reason* for giving Rho–GAM.

**130.** The same duty is owed both the mother and her unconceived child—i.e., the duty to prevent the mother's sensitization if she is a fit candidate for Rho–GAM. It follows that a breach of the duty owed the mother would also breach the duty to the unconceived child.

**131.** To recover for wrongful death caused by negligence, the negligence must proximately cause the death. *Runyon, supra* note 49 at 948. The injury complained of must have been reasonably foreseeable to the negligent party. *Bradford Securities v. Plaza Bank and Trust,* Okl., 653 P.2d 188, 190–191 (1982); *Pepsi Cola, supra* note 45 at 997.

failed to give the mother Rho–GAM, (3) the mother had become sensitized and (4) Donald, the first child born alive to the mother after she had been sensitized, was afflicted with the very disease Rho–GAM was designed to prevent. Preconception sensitization of the mother is causally connected to the child's fatal disease. The jury could find that the doctors were at fault and the child died from a condition that was causally related to lack of Rho–GAM drug. In short, the trial court did not err by refusing to direct a verdict for the doctors.

## B.

### WHETHER THE MOTHER'S CLAIM WAS TIME BARRED WAS A QUESTION OF FACT FOR THE JURY

■ According to the doctors, the trial court should have held that the mother's claim was time barred.[132] Because the so-called discovery rule approach to limitations applies in medical malpractice,[133] the time from which the statute begins to run depends upon the plaintiff's knowledge of her injury. The critical determination is whether she knew or should have known she was injured. The limitations issue must be submitted to the jury when the facts about the injury's discovery are disputed.[134]

The mother admitted she had been told both (1) that she needed Rho–GAM after each pregnancy and (2) the dangers of not receiving it. The doctors introduced evidence that the mother learned in April 1982 that she was not given Rho–GAM that January.[135] The mother urged she did not understand that this meant she might have become sensitized by the doctors' failure to give her the drug. According to the mother, the information she had been given in 1978 and 1980 was in the back of her mind, but she did not remember it at the time in question.

Although a March 7, 1983 blood test shows that the mother had become sensitized, she denies knowledge of the test's positive results. Evidence was admitted from which the jury could infer that the mother knew she had been sensitized—i.e., Dr. Barton's notes reflect she told him in March 1983 that she had antibodies against Rh.[136] If the mother knew or *should have known before July 12, 1983* that she was sensitized by the doctors' substandard conduct, the action, filed July 12, 1985, was *time barred.* Conflicting evidence about what the mother knew or should have known about her own condition made the limitations issue one for the jury to decide; the trial court did not err by submitting the issue to the triers.

---

132. 76 O.S.1981 § 18 provides in pertinent part: "An action for damages for injury or death against any physician, health care provider or hospital licensed under the laws of this state, whether based in tort, breach of contract or otherwise, arising out of patient care, shall be brought *within two (2) years of the date the plaintiff knew or should have known, through the exercise of reasonable diligence, of the existence of the death, injury or condition complained of....*" [Emphasis supplied.]

133. *Reynolds v. Porter,* Okl., 760 P.2d 816, 820 and n. 8 (1988); *McCarroll v. Doctors General Hosp.,* Okl., 664 P.2d 382, 385–386 (1983).

134. *McCarroll, supra* note 133 at 385–386.

135. There is conflicting evidence not only with respect to what the mother *knew,* but also concerning what she *should have known.* The doctors contended that when Dr. Keuchel told the mother she did not receive Rho–GAM, she had a duty to get a blood test and find out whether she had become sensitized. *The doctors' expert, Dr.*

*Gorman, testified that 50% of the time, antibodies do not show up in a blood test until the woman becomes pregnant again.* He called this phenomenon *"sensitization without antibodies"* or *"sensibilization."* The mother introduced blood tests taken by the Red Cross when she donated blood on May 11, 1981, October 16, 1981 and May 21, 1982. *The tests did not show any antibodies.* The jury might have inferred that the mother had *no safe way to discover* whether she had been sensitized.

136. Evidence reveals that the mother consulted Dr. Clyde W. Barton in early 1983 about her inability to become pregnant. When it appeared that she was pregnant, Dr. Barton referred her to Drs. Dean, Hall & Ryker. Dr. Ryker sent her for a blood test on March 7, 1983 to find out whether she had been sensitized. *The test results were positive.* The mother urges she was *not told* that she had been sensitized. Dr. Barton testified that his office notes show that in a March 28 conversation, the mother *told him she "has antibodies against Rh"*—i.e., that she had become sensitized.

## SUMMARY

### A. THE WRONGFUL DEATH CLAIM

Although the *evidence* in the wrongful death claim *calls for the jury's consideration of supervening cause,* the instruction that was given is *fatally flawed.* Its effect was to withhold foreseeability from submission to the triers as a disputed fact issue. *There is indeed a strong probability that this charge misled the jurors and caused them to reach a result different from that they would have reached but for the flawed instruction.*

### B. THE MOTHER'S BODILY INJURY CLAIM

The evidence did not support a *mistake-of-judgment instruction.* The unwarranted instruction was highlighted by Dr. Keuchel's frequent references to a use of his judgment and his counsel's comments during the closing argument. We find a *strong probability that it misled the jurors and caused them to reach a result different from that they would have reached but for the flawed jury charge.*

Upon retrial, if the evidence is the same, a *contributory negligence instruction* must be *given* in the mother's claim *only; proximate cause* should be a *jury question,* as it was in the earlier trial. The instructions as a whole correctly place upon the doctors the *burden of proving contributory negligence.* The jury must also be instructed that *while ordinary negligence of the plaintiff may be used as a defense against gross negligence, it may not be considered as a defense against any form of conduct found to be willful and wanton or intentional. Bifurcation* of the two claims for retrial will *prevent in the trial of the wrongful death claim* the jury's imputation of *the mother's contributory negligence to the child.* A *punitive damages instruction* was *warranted* by the evidence.

### C. THE DOCTORS' COUNTER-APPEAL

The trial court did not err by *failing to direct a verdict for defendants* on the wrongful death claim. A claim for the wrongful death of a child born alive may be pressed under the circumstances present here, *where the direct causal connection between failure to prevent the mother's sensitization and the subsequent birth of the child with a fatal condition is crystal clear.* Conflicting evidence about what the mother knew or should have known about her own condition made the *limitations issue* one for the jury; its submission is free from error.

**JUDGMENT REVERSED AND CAUSE REMANDED FOR NEW TRIAL.**

HODGES, C.J., LAVENDER, V.C.J., and HARGRAVE, and WATT, JJ., concur.

SUMMERS, J., concurs in result.

SIMMS and KAUGER, JJ., concur in part; dissent in part.

ALMA WILSON, J., dissents.

SUMMERS, Justice, concurring in result.

I too would reverse and remand for new trial, but would not submit to the jury the defendants' theory of "supervening cause." The opinion correctly sets out the three-pronged test for a supervening cause which will insulate the original actor/defendant/doctor from liability: the "new" cause must be (1) independent of the original act, (2) adequate of itself to bring about the result, and (3) one whose occurrence was not reasonably foreseeable to the original actor/defendant/doctor. *Thompson v. Presbyterian Hospital, Inc.,* 652 P.2d 260, 263 (Okla.1982); *Long v. Ponca City Hospital, Inc.,* 593 P.2d 1081, 1084 (Okla.1979).

Under the theory as urged by defendant doctors prong one is clearly present, and prong three is arguably a proper question for the jury under these facts. But prong two, under any theory defendants advance, is simply missing. This second prong is critical because "[n]ot every intervening cause will insulate the original negligent actor from liability." *Thompson,* 652 P.2d at 264. If a causal factor is capable of combining with another act or omission to produce the injury, each actor may be subject to liability. *Id.* The opinion appears

**368**

to confuse the mother's alleged wilfulness in getting pregnant against all advice and common sense, with the requirement that the pregnancy be "adequate of itself" to cause the result. The result was that Donald died after four days of life. Even under defendants' theory *two* things were required to *combine* to bring about Donald's death: (1) the doctor's negligent failure to administer Rho–GAM following her fourth pregnancy, and (2) her wilful pregnancy knowing of her condition. Her pregnancy alone, even if deliberate, was not "adequate of itself" to cause the result.

The doctors have not conceded that the failure to give Rho–GAM amounted to negligence. The question of supervening cause will not come into play, however, unless it is determined that there was some earlier actionable act or omission by the doctors. *See Thompson,* 652 P.2d at 264. Regardless of the outcome of this issue, an instruction on supervening cause is not warranted. If there is no negligence on the part of the doctors, the instruction is superfluous. If there is negligence by the doctors, the second prong of the test is still not satisfied and the instruction would be improper. The supervening cause instruction should not be given where, as here, the result could not have come about in the absence of the first actor's alleged misconduct, which was failure to give Rho–GAM. The mother's alleged wilful and foolish impregnation could not have been "adequate of itself" to cause the result.

SIMMS, Justice, concurring in part, dissenting in part:

In my opinion the instruction containing the language "elected to become pregnant" is neither vague nor ambiguous. I believe the instruction was properly given to the jury and I dissent to that part of the majority opinion holding otherwise.